[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 05-13169

————————————————

D. C. Docket No. 04-80071 CR JIC

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 29, 2007
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RASHARD REDDICK,
a.k.a. PIT BULL,
JUAN BANNISTER,

Defendants-Appellants.

————————————————

Appeals from the United States District Court
for the Southern District of Florida

————————————————

**(May 29, 2007)**

Before TJOFLAT, FAY and SILER,* Circuit Judges.

PER CURIAM:

_____
        *Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

Defendants Rashard Reddick and Juan Bannister, who were convicted of violating both the Federal Bank Robbery Act ("FBRA") and the Hobbs Act, appeal their convictions as multiplicitous. They also challenge the overall sufficiency of the evidence used to convict them, the district court's decision to admit certain statements, and its application of the sentencing guidelines.

The Government charged both defendants with conspiracy to commit armed bank robbery and with perpetrating armed bank robbery under the FBRA, with obstructing interstate commerce through threat or violence under the Hobbs Act, and with brandishing a firearm during these crimes pursuant to 18 U.S.C. 924(c)1(C). Reddick's charges derived from the armed robbery of a single bank in Port St. Lucie, Florida on April 14, 2004. Bannister's charges stemmed from three separate bank robberies, which he allegedly masterminded. One set of charges derived from the Port St. Lucie incident where Reddick and Bannister were alleged conspirators. Another derived from a nearly simultaneous incident at a bank in Tequesta, Florida on April 14, 2004. The third set of charges related to the armed robbery of a bank in West Palm Beach, Florida on November 10, 2003. A jury found Reddick guilty on all four counts charged, and a separate jury found Bannister guilty on the twelve counts alleged in his indictment. The district court sentenced Reddick to 199 months, and Bannister to a combined term of 984

months. For the reasons set forth below, we affirm the defendants' convictions and their sentences.

Because the defendants both allege double jeopardy arguments in their appeals, we devote the first section of our discussion to that issue and review the defendants' arguments together. Both defendants also question the sufficiency of the evidence that was used to convict them and we review that evidence together in the second section. We break the remaining discussion into two parts, addressing Reddick's individual evidentiary challenges and sentencing issues in one section and Bannister's in another.

## I. BACKGROUND

Government witnesses testified to the following facts at trial. The defense did not challenge the credibility of the eyewitnesses or police investigators who testified to these facts.

### A. The Bank of America Robbery

On November 10, 2003, around 11:00 a.m., three masked men entered a Bank of America in West Palm Beach, Florida and held it up for approximately $9,078. Security cameras recorded the robbery. The men entered the bank from the side entrance where a security guard sat with his back to the door and his eyes trained on the lobby. After the men disarmed the new security guard, they ordered everyone else to the floor at gunpoint. There were nine tellers, several other

3

employees, an outside contractor, and a half-dozen customers in the bank at the time.

Witnesses recounted that the men were dressed in black from head to toe and wore gloves over their hands and face masks that obscured everything but their eyes and the bridges of their noses. The only way that witnesses could distinguish them was by their relative stature. One robber was tall, another was medium height and one was noticeably short in comparison to the other two. By all accounts, at least two of the men brandished long rifles. While the two armed men rounded up employees and customers and corralled them in the lobby, the third man attempted to get beyond the locked electronic doors that led into the teller area. Eventually his cohorts urged him to just jump over the counter and he did, landing alongside the work station of teller Sylvia Davis. At that point, he saw teller Sylvia Davis, crouching under her work station, and gestured for her to come out.

When Davis crawled out from her hiding place, she saw another masked man on the opposite side of the counter with his rifle trained on a customer. Although both men were masked, Davis was able to tell that they were black from the skin that was exposed around their eyes and the bridges of their noses. Her co-worker, Thomas De Stefano, who was crouching in the lobby, saw the man who

had vaulted over the counter train a gun on Davis' head as she let him into her cash drawer.

While the robbers were occupied at Davis' work station, they failed to notice a Hewlett Packard technician, Edwin Vargas, who was kneeling behind the teller area, attaching cabling to the base of a new printer. He, however, noticed them, and from his vantage point, which was just alongside a plate glass window that looked out on the parking area, he saw them escape minutes later. One man exited from the doors on the south side of the bank and entered a white van that had its doors open. The van was parked alongside Vargas' repair van. The other men followed a minute later.

Vargas got in his van and pursued the men out of the parking lot. He saw them turn behind the plaza and head down the street of an adjoining housing development. When he got to the end of that street, he saw it was a dead-end. The white van was parked at the end of the street with its doors open and a black pickup truck with an extended cab was pulling away from the opposite side of the street. He called 911 to report what was happening.

Officer Robert Rowe of the West Palm Beach Police Department proceeded to the housing complex where Vargas had seen the getaway car. When Rowe arrived he saw a white Dodge Caravan with its doors open. The car was still running, but no keys were inside. He noted that the right passenger seat was

stained with red dye and several loose bills rested on the floor of the van. He ran the tags on the vehicle and learned that it was stolen. The black pickup seen leaving the area matched the description of another stolen car. Police in Riviera Beach, which is just north of West Palm Beach, recovered the other getaway car, the black pickup truck, in a housing complex later that day.

Meanwhile, Laura Downs, the senior teller coach for the Bank of America, and Belinda Garcia, the bank's customer service manager, blocked off access to the teller area of the bank and performed an audit of Davis' cash drawer. Downs determined that the robbers escaped with $9,078.90. Their take included some rarely seen two dollar notes, several twenty dollar "bait bills" and a dye package of twenty dollar notes. The dye package was designed to release a red dye shortly after the notes were removed from the bank. The bank had recorded the serial numbers on the stack of bait bills so they could trace them in the event of a robbery. Downs closed the bank, which would normally have remained open until 4:00 p.m. so that Bank of America security personnel and law enforcement official could conduct investigations.

Law enforcement officers with the West Palm Beach Police Department checked the interior surfaces of the recovered getaway cars for latent fingerprints that might help them identify the robbers, but failed to recover anything. The

6

police had no leads at this point, apart from the descriptions of the eyewitnesses and the videotaped images captured on the bank security cameras.

Nearly one month later, however, on December 10th, 2003, robbers employing a similar *modus operandus* ("m.o.") held up a Wachovia Bank in West Palm Beach. Although police arrested an individual two days after the Wachovia robbery who turned out to have currency on him that was traceable to the robbery, they had no other evidence to link him to the crimes. They interviewed the individual, Ahmad Adams, who went by the nickname "Dugey." They also interviewed a passenger who was traveling with Adams' car when police pulled Adams over. The passenger's name was Juan Bannister. Although Bannister agreed to speak with Detective Houston of the West Palm Beach violent crimes division about recent bank robberies, he told the detective that he wasn't doing banks. Bannister suggested the detective approach him again if and when he could produce a picture of him inside a bank.

Detective Houston was unable to get any further leads on the Bank America robbery for several months. Then, on March 27, 2004, Houston learned that an individual, who had just been brought into jail for drug and firearm offenses, had some information on bank robberies. Accordingly, Detective Houston interviewed the individual, Albert Minus, a convicted felon who had been on supervised

release from an earlier drug and firearm sentence when police found him violating probation.

Minus told Houston that he overheard Juan Bannister refer to a bank robbery at 45th Street and Military Trail in West Palm Beach in which the robbers had disarmed a security guard. Minus was at Bannister's apartment at the time along with a number of other people. Minus had been dating Bannister's sister, Tanisha, but he also said he knew Bannister because Bannister had been close friends with Minus' older brother, who was now deceased. According to Minus, Bannister said something to the effect that you should have seen the look on the security guard's face when "Dugey" took his gun away from him as the guard was attempting to draw it on "MG," who was also known as Mike Lewis. Detective Houston was familiar with "Dugey" or Ahmad Adams because officers had found him with currency that was traceable to an armed robbery at a Wachovia bank several months earlier.

Minus said he had the impression that Bannister was recounting something he heard from the other participants in the robbery because he didn't think that Bannister went inside the bank himself. Detective Houston had already concluded that Bannister did not participate in the robberies on the inside because he walked with a profound limp, which would have been readily visible to eyewitnesses and would have been caught on the security cameras.

Minus revealed other facts that indicated Bannister might have some connection to the robberies, however. For example, Minus recounted that he had seen currency with red dye on it when Bannister's sister Tanisha came to visit him at a half-way house where he was staying. According to Minus, he saw Tanisha reach in her purse and he spied several two dollar bills. He hadn't seen that denomination before so it caught his attention. Tanisha, who was unemployed at the time, offered him some money, but Minus declined noticing that the bills had red dye on them. On a subsequent visit, Tanisha told Minus that the money had come from a "lick" or robbery, but she didn't offer any more details. Detective Houston noted that two dollar bills were rare, although several had been taken in the Bank of America robbery. Police did not release this sort of information to the public, which led Houston to conclude Minus' information was credible.

Minus told Detective Houston that Bannister was staying in his girlfriend's third-floor apartment at 2100 Australian Avenue in West Palm Beach, and gave him his cell phone number. Minus also told Houston that Bannister spent time at a friend's apartment on the fourth floor of the same complex, and gave police an address for Mike Lewis. The police were not aware that Bannister had moved and was living with his girlfriend and did not have any information on Mike Lewis prior to this.

In addition to providing Houston with information on bank robberies, Minus also disclosed facts about other violent crimes which Houston considered reliable. Houston did not offer Minus any sort of deal in exchange for this information. Detective Houston indicated, however, that Minus' continued cooperation might convince prosecutors to ask for a lighter sentence when the time came for Minus' hearing on the drug and firearm charges.

## B. The First National Bank and Trust Robbery

On April 14, 2004, shortly after 9:00 a.m., several armed men held up the First National Bank in Tequesta, Florida. Bank security cameras captured the robbery on film. The bank had just opened. Five employees were present, but there were no customers inside at this point. Eileen St. Denis, the Vice-President and Regional Manager of First National Bank, was meeting with another manager at the time. Hearing a commotion, she looked up to see five hooded men burst through the front doors of the bank, brandishing assault rifles. One of the men came over to her office and ordered her to get down on the floor, threatening to kill her if she did not comply.

St. Denis reported that this man appeared to be the tallest one of the five and that his gun was a long black rifle which sported a brushed silver piece on one section. She also reported, as witnesses had in the case of the Bank of America

10

robberies, that the robbers were dressed entirely in black and wore gloves on their hands and masks over their faces.

Marie Salter, one of the bank's tellers, was standing at a copier behind the teller line when the men entered and ordered everyone to get down on the floor. She complied, but stood up when the robbers began to demand money. Salter stood up and handed the robbers the keys to her cash drawer from over the counter. She immediately crouched back down on the floor. One of the men then jumped over the counter and began to go through her cash drawer. When he complained that there was no money in the drawer, Salter stood up again and called out for Rayma Buckles, the acting head teller, who had the combination to the vault. Buckles did not respond immediately, but when Salter called out the second time, Buckles got up and approached the counter. One of the robbers came up behind her and prodded her towards the counter with his gun.

Realizing that she had left her keys behind and could not get through the electronic doors that led into the teller area, Buckles asked the robber behind the counter to open the doors. He refused. When she attempted to go back to her desk for the keys, the robber who was standing behind her refused to let her turn around. Both men ordered her to jump over the counter. Buckles tried and made it to the edge of the other side, but before she could jump down, the robber behind the teller line grabbed her by the neck and pulled her down onto her knees. The

11

robber who had been standing beside her jumped over the counter as well and both men dragged Buckles across the floor to the vault. Buckles opened the vault and stood just outside.

The men emerged from the vault after a few minutes and dragged Buckles back to the teller line. Then they jumped the counter once more and fled. Salter stood up a few seconds after they left and was able to see the men depart in a gold SUV, which she later identified as a gold Jeep. She called in the description to 911.

After the men fled, St. Denis and another senior Vice -President audited the head teller's cash drawer and the vault. The men had removed all the money in the cash drawer and the vault, including ten $100 bills that represented "bait money." St. Denis determined that the bank's loss totaled $94,670. She closed the bank at 9:11 a.m., just minutes after the robbers left, and it remained closed for the rest of the business day, which would normally have ended at 4:00 p.m.

## C. The SunTrust Bank Robbery

On April 14, 2004, minutes after robbers held up the First National Bank in Tequesta, armed robbers struck again at a SunTrust bank in Port St. Lucie, Florida. The bank was located at the front of a shopping plaza. Bank surveillance cameras recorded what happened next. There were five employees in the bank at that time, and several customers. As in the case of the Bank America and the First National

12

bank robberies, the men burst through the doors of the bank, brandishing assault weapons. They were dressed entirely in black and wore gloves and face masks that obscured everything from view but their eyes and the bridges of their noses. The only way that witnesses could distinguish the men was on the basis of their relative height and by the fact that one man, the tallest one, who was at least 6'2", shouldered a long rifle with a strap.

Two of the men began to round up the employees and customers at gunpoint, ordering them to lie down in the lobby, while the shortest member of the group jumped over the counter to the registers. He landed right next to tellers Terri Robinson and Pamela Cenk and ordered them to open their cash drawers. The tellers complied. Ms. Cenk saw the man pick up the stack of notes that contained the dye pack, and throw it back into her drawer. After he had removed the money from the cash drawers, he demanded to know who had the keys to the vault. Cenk replied that she did and the robber instructed her to take him back to the vault and open it. Cenk opened the vault for the robber, noting, as she looked at him, that the skin surrounding his eyes and the skin on the bridge of his nose was black. The robber began to fill a bag with the currency and after a short period, one of his cohorts joined him to help. Ms. Cenk noticed that the cohort was also black. Within minutes the two men were done and left.

Witnesses called 911 to report that three black males drove away from the bank in a blue Jeep Cherokee, exiting out the back of the shopping plaza. At that time, a magazine vendor, Dean Orrison, was parked behind a Publix store which was located in the same shopping plaza, preparing his magazine delivery. He heard a horn sound behind him, and turned to see a blue Grand Cherokee heading towards him at about 55 miles per hour. Orrison jumped out of the way to let the car pass and noticed as he did so that a person was leaning out a partially open door on the front passenger side of the vehicle. The passenger was dressed in black and had a turban-like headdress and mask. Orrison reported the incident to the assistant manager of the supermarket and the market's delivery receiver, fearing that the person he saw was some sort of terrorist.

Shortly thereafter, Officer John Brazas of the Port St. Lucie Police Department received a report about the SunTrust Bank robbery. Recalling that he had heard about an incident in which a getaway car was found abandoned near the scene of a bank robbery, he drove around the back of the shopping plaza where the bank was located. He observed a blue-colored jeep in the alleyway behind a Kmart store at the far end of the shopping plaza. The jeep was still running, but no keys were in the ignition and both the steering and the lock showed signs of damage consistent with a stolen vehicle. Officer Brazas subsequently received information from the Boca Raton Police Department about two cars that had been stolen from a

14

hotel parking lot the night before. One of the cars was a blue Jeep Cherokee; the other a grey minivan.

As Officer Brazas was investigating the abandoned vehicle at the back of the shopping plaza, Robert McGhee, a criminal investigator for the Port St. Lucie Police Department, arrived on the scene of the robbery. When he walked into the bank, he saw a flowered pillowcase with stacks of money inside it on the floor of the lobby. He observed that the pillowcase had a red stain on it and a hole burned through the fabric, pinpointing the place where a dye pack had exploded inside. Bank employees reported that a passerby had found the pillowcase in the parking lot and turned it in. When Agent McGhee went outside to inspect the parking lot he found an area at the back of the lot that was indeed stained red.

Eva Shaw, a regional manager for SunTrust, arrived within a half-hour of the robbery to perform an audit. She determined that the bank lost a total of $60,381, including $46,000 that had been damaged when the dye packs activated, and several "bait bills' in twenty-dollar denominations. The bank had to ask the U.S. Treasury to replace the damaged money. SunTrust officials closed the bank for the remainder of the business day.

Later that afternoon, Detectives Bryan Arlotta and Antonio Matias of the West Palm Beach Police Department's auto-theft division received a notice to be on the lookout for two vehicles that had been used in bank robberies to the north

15

of West Palm Beach. The two robberies took place at nearly the same time and the robbers appeared to be following an m.o. used in earlier West Palm Beach bank robberies. The lookout notice or "BOLO" described one of the vehicles as a silver minivan.

Detective Arlotta had been canvassing the neighborhood near 2100 Australian Avenue in West Palm Beach for stolen cars when he noticed a suspicious group of individuals exit a minivan that matched the description of the silver minivan in the BOLO. The men were dressed entirely in black. When they spotted the detective in his unmarked police vehicle, they took off. Later a young man appeared and wiped the hood of the van with a tee-shirt. Arlotta called his partner Detective Matias, who arrived on the scene within minutes, and several other officers, who established a watch outside the apartment that the men entered, which was on the third floor. Officers saw Juan Bannister exit that unit, apartment number 315, sometime thereafter and go upstairs to apartment number 414 with several other individuals.

The detectives ran the numbers on the license tag, which came back clear, but they decided to walk around the car, nonetheless. Peering inside the vehicle, they noted that its steering column and ignition appeared damaged in a manner consistent with stolen cars. They entered the vehicle to look for the owner registration card and found a business card. Shortly thereafter, they heard from a

colleague in Boca Raton who was looking for a silver minivan that had been stolen the night before. Detectives Arlotta and Matias were able to determine at this point that the silver minivan was indeed stolen. They found several black tee-shirts and a new black glove in the vehicle.

The auto-theft detectives radioed Detective Houston who had already directed officers to both Bannister's and Michael Lewis' addresses, suspecting that they might be involved. Detective Houston rushed to 2100 Australian Avenue. Houston verified that Erica Wyatt was renting apartment 315, as Albert Minus had told him two weeks earlier when they discussed the Bank of America robbery, which had followed a similar m.o. He also verified that apartment 414, which officers had seen Bannister enter, was rented to a girlfriend of Josh Holloway, the individual that Minus had named as Bannister's friend. Houston conferred with agents from the Federal Bureau of Investigation ("FBI") and decided to secure a search warrant for both apartments. In the meantime, police established a perimeter around the apartment complex and began evacuating tenants in neighboring units.

### D. The Police Search at 2100 Australian Avenue, West Palm Beach

Police secured a search warrant for units 315 and 414 at 4:00 p.m. on April 14, 2004. As they were about to perform the search, Bannister attempted to exit from unit 414, and police arrested him. When they entered unit 414, they found a

seventeen year-old black youth, John Wilkerson, inside the apartment and two assault rifles that matched the descriptions and surveillance video images of ones used in the robberies at SunTrust and First National Bank.

No one was in unit 315, the apartment where Bannister lived with his girlfriend, when police entered, but they found ample evidence connecting Bannister with the bank robberies. The search yielded black clothing that matched the description of the clothing worn in the bank robberies and a pillowcase that matched the fabric and pattern of the pillowcase which the robbers left behind at the SunTrust bank in Port St. Lucie earlier that day. Police also recovered $14,700 from a safe, $440 from a dresser drawer and $5,140 from a pile of clothing in a bedroom closet. Altogether the cash totaled $20,480. Police considered this an unlikely figure for a tenant in government subsidized housing to have on hand, particularly in this case, where the tenant, Erica Wyatt, was a single mother with a monthly income of roughly $400. Police subsequently determined that some of the money in the pile on the bedroom floor and some of the money in the safe were "bait bills" traceable to the First National Bank robbery that took place that morning in Tequesta, Florida.

### E. The Arrests and Confessions of Co-Conspirators

Police took Wilkerson and Bannister to the West Palm Beach police headquarters, but kept them sequestered from each other. Detective Houston

18

interviewed Wilkerson early the next morning and Wilkerson confessed to participating in the armed robbery of the SunTrust bank, providing a detailed description of the crime and how it was planned. Houston taped the interview. Wilkerson identified the other participants as Rashard Reddick and Juan Bannister and a third "anonymous" individual. Wilkerson would later identify the "anonymous" third person as Mike Lewis, someone with whom he was friends, but in his initial interview, he only identified him as an anonymous person. He did, however, provide police with a physical description of the third person that, as police would later find, fit Mike Lewis perfectly.

He told police that the anonymous person was responsible for jumping the teller counter to get the money from the vault and that Rashard Reddick was responsible for rounding up the employees and standing guard over them. Wilkerson said that he provided back-up to the robber on the other side of the teller line. Wilkerson revealed that he ended up dropping the pillowcase that contained the money from the robbery when a dye pack exploded as they were leaving the parking lot. Bannister did not enter the bank, Wilkerson reported, because he was responsible for driving the second getaway car which he had parked and waiting at the back of the bank shopping plaza.

According to Wilkerson, Bannister was not merely the getaway car driver, but the ringleader of the entire SunTrust operation and the outfitter for a separate

robbery at the First National Bank. Wilkerson told police that he accompanied Bannister to a Wal-Mart the night before the robbery so that they could buy the additional black clothing, gloves and face masks that would be needed for two teams of robbers.

Wilkerson also provided details on the aftermath of the robbery. He told police that once they arrived at Erica Wyatt's apartment complex, they unloaded the guns, wrapping sheets around them, and the money and carried them upstairs. They divvied up the money from the SunTrust robbery alongside another team of robbers who had held-up the First National Bank. That team included Bannister's brothers and his father. Wilkerson said that he saw Bannister put money that the other team gave him in a safe.

Once Reddick and Lewis received their share, they left, Wilkerson told police. He remained behind with Bannister and several hangers-on. As they were about to leave and take one of the rifles back to a recording studio that Bannister operated, they noticed Detective Arlotta's unmarked police car outside. Bannister decided to move the guns up to his friend's apartment on the fourth floor, and Wilkerson stayed in apartment 315 to hide his share of the money, which was roughly $2200. As more police cars gathered below, Wilkerson retreated to Bannister's friend's fourth floor apartment where police found him when they came to execute the search warrant.

West Palm Beach police decided to release Wilkerson after he provided his statement to explore the possibility of charging him with federal bank robbery charges. Because Wilkerson was a juvenile at the time, the U.S. Attorney General's Office would have to approve and certify the charges against him, a process which was not automatic. Police did not offer Wilkerson any immunity in exchange for his confession. While Wilkerson was out on release, however, police arrested him for another armed bank robbery, and offered him use immunity for that offense if he would agree to participate in the government case against his co-conspirators on the SunTrust robbery. When they finally charged Wilkerson as an adult for the SunTrust bank robbery, he pleaded guilty to armed bank robbery and to use of a firearm in connection with that crime. He received consecutive sentences of 46 months and 84 months and agreed to serve as a government witness in any remaining SunTrust prosecutions.

Police arrested Wilkerson's alleged co-conspirators, Michael Lewis and Rashard Reddick, on October 21, 2004 and charged them with armed robbery of the SunTrust bank. Both men are black males and both matched descriptions and video images of the robbers on the basis of stature. Lewis was under 5'8" and wiry, matching the description of the robber who first jumped behind the teller line. Reddick was a muscular 6'2", matching the description of the robber who held employees down in the lobby.

Lewis, who was serving a suspended sentence at the time for auto theft and awaiting sentencing for carrying a concealed weapon, pleaded guilty to armed robbery of the SunTrust bank and to using a firearm in connection with the robbery. He agreed to cooperate in the government's case against Reddick and Bannister and was offered use immunity for his participation in the armed bank robbery of the Wachovia bank on December 10, 2003.

Reddick agreed to speak with police after he was arrested for his role in the SunTrust robbery and he confessed to being a participant in the armed robbery. He identified himself and the other participants in surveillance photographs of the robbery, naming John Wilkerson as another participant and Bannister as the driver of the getaway car. Reddick did not name Lewis as the other participant, but pointed him out in surveillance photographs as "Vince."

Meanwhile, Bannister had been placed in a holding cell with Albert Minus, who was awaiting a hearing for violation of his probation. Minus expressed surprise to see Bannister and asked him why he had been arrested. According to Minus, Bannister responded that the police said something about banks and later mentioned "we did a lick for $94,000 and ten - -$13,000."

## F. Legal Proceedings Against Bannister and Reddick

On December 16, 2004, a federal grand jury returned an indictment against Juan Bannister, Rashard Reddick, a/k/a "Pit Bull," and Michael Lewis, a/k/a

"MG" for a series of offenses in connection with the armed robberies of the Bank of America, First National and SunTrust banks.[1] The indictment charged each of the defendants with the following offenses: conspiracy to commit armed bank robbery under 18 U.S.C.§ 371; the commission of bank robbery by force or violence under 18 U.S.C. § 2113(a) and (d); interference in interstate commerce through threat or violence under 18 U.S.C. §1951(a); and brandishing a firearm during the commission of a bank robbery in violation of 18 U.S.C.§ 924(c)(1)(A). The United States ("Government") filed twelve counts against Bannister, charging him in connection with the armed robberies of the Bank of America, First National Bank, and SunTrust Bank. Reddick and Lewis were named in four counts each for their roles in the SunTrust bank robbery.

Lewis entered a guilty plea on his charges and agreed to serve as a witness for the prosecution. Thereafter, the Government proceeded to trial with the charges against Reddick and Bannister on February 15, 2005. The district court empaneled two separate juries for the trial. In addition to the testimony referred to above, the Government also presented DNA evidence that linked Bannister to the pillowcase left at the SunTrust bank and to the steering wheel of one of the getaway cars. Reddick moved for a judgment of acquittal at the conclusion of the

---

[1]This was the fifth superceding indictment against the defendants.

Government's case, but the court submitted his case to the jury. Neither Reddick nor Bannister presented any evidence in his own defense.

On March 7, 2005, both juries returned verdicts that found the defendants guilty as charged on all counts. Reddick renewed his motion for judgment of acquittal, but the court denied it. On May 27, 2005, the court delivered its sentence. The court sentenced Bannister to imprisonment for a period of 984 months. This sentence included concurrent jail terms of 60, 296, and 240 months on the conspiracy, armed bank robbery, and obstruction of commerce violations, and consecutive jail terms of 84, 300, and 300 months for the corresponding firearm offenses. The court also ordered Bannister to pay restitution in the amount of $177,275.62. Reddick received a sentence of 199 months of imprisonment. His sentence included three concurrent jail terms of 60, 115 and 115 months on the conspiracy, armed bank robbery, and obstruction of commerce violations, and one 84 month jail term on the accompanying firearm offense. The court ordered the latter term to run consecutively with the terms for the underlying offenses and ordered Reddick to pay restitution in the amount of $13,718.01.

Reddick filed an appeal of his conviction and sentence with this Court on June 1, 2005. Reddick argued that his convictions for armed bank robbery and interfering in interstate commerce were multiplicitous. So too, Reddick argued, were his convictions for possession of a firearm during the commission of a

24

robbery and armed robbery. Reddick did not raise these challenges at trial, however. Reddick also challenged the sufficiency of the evidence that was used to convict him, and argued that the court erred when it denied his motion for judgment of acquittal. Additionally, Reddick challenged the court's decision to admit the testimony of his alleged co-conspirators, asserting that the Government "paid" them for their testimony. Reddick did not object to the testimony when it was introduced at trial, however. Finally, Reddick argued that the court erred when it applied the sentencing guidelines.

Bannister, Reddick's co-defendant, filed a separate appeal with this Court on June 6, 2005. He argued, as Reddick had, that the armed bank robbery and interference in interstate commerce conviction were multiplicitous. Bannister argued that it was similarly violative of the Fifth Amendment prohibition against double jeopardy to impose multiple sentences for these convictions, although he did not raise these issues during trial. Bannister also challenged the admission of certain testimony that he had attempted to exclude with a pre-trial motion in limine. Finally, Bannister challenged the court's application of the federal sentencing guidelines.

## II. STANDARDS OF REVIEW

Since the appellants challenge their convictions and sentences on multiple grounds, we must apply several different standards of review to their claims. First

25

and foremost, we note that the appellants failed to assert their double jeopardy claims at trial and this precludes us from reviewing those claims for anything other than plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731 (1993); *United States v. Pielago*, 135 F.3d 703, 708 (11th Cir. 1998).[2]

A "constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Olano*, 507 U.S. at 731 (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)). Under Rule 52(b) of the Federal Rules of Criminal Procedure, appellate courts have limited power to correct errors that were forfeited in this manner. Rule 52(b) provides: "(b) PLAIN ERROR.  A plain error that  affects substantial rights may be considered even though it was not brought to the court's attention."

As this Court noted in *Pielago*, 135 F.3d at 711, we may find evidence of plain error in either one of two situations. One occurs where an intervening decision of this Court or the Supreme Court is squarely on point and invalidates a lower court ruling. *See,* e.g., *United States v. Walker*, 59 F.3d 1196, 1198 (11th Cir. 1995), where an intervening decision of the Supreme Court that held the Gun Free School Zone Act unconstitutional made the defendant's conviction under that

---

[2]Ordinarily we would review a decision to deny a double jeopardy claim *de novo,* as it involves a question of law. *United States v. Harvey*, 78 F.3d 501, 503 (11th Cir. 1996).

statute plain error. We will also find plain error where an erroneous decision appears to be particularly egregious, and strikes at a core principle embodied in the violated law or rule. *Pielago*, 135 F.3d at 711. *See*, e.g., *United States v. Quinones*, 97 F.3d 473, 475 (11th Cir. 1996), where we found that the district court failed to ensure a criminal defendant understood the nature of the charges against him, one of the core principles embodied in Fed. R. Crim. P. 11.

If we find plain error, we have the discretion to correct the error if it "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Young*, 470 U.S. 1, 15 (1985) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). We also review claims of evidentiary error that were not raised at trial, such as those which Reddick asserts in this case, under a plain error standard. *See* Fed. R. Crim. P. 52(b); *United States v. King*, 73 F.3d 1564, 1571-72 (11th Cir. 1996).

Where a defendant objects to the admission of evidence at trial, however, as Bannister attempted to do in this case by filing pre-trial motions in limine, we will review the court's ruling for abuse of discretion. *See United States v. Beasley*, 72 F.3d 1518, 1524 (11th Cir. 1996). Yet, even if we find an abuse of discretion, we will only reverse if it appears that the error is reasonably likely to have affected the defendant's substantial rights. *Id*. at 1525 (citing *United States v. Sellers*, 906 F.2d 597, 601 (11th Cir. 1990)).

Appellate courts review sufficiency of evidence claims *de novo*, evaluating the evidence in the light most favorable to the government, and drawing all reasonable inferences and credibility assessments in the government's favor. *United States v. Harris*, 20 F.3d 445, 452 (11th Cir. 1994). An appellate court will likewise examine a decision denying a motion for judgment of acquittal under a *de novo* standard of review. *United States v. Bowman*, 302 F.3d 1228, 1237 (11th Cir. 2002). We will uphold a jury verdict unless we determine that no trier of fact could have found guilt beyond a reasonable doubt. *United States v. Battle*, 892 F.2d 992, 998 (11th Cir. 1990).

When defendants object to the application of the Federal Sentencing Guidelines during sentencing, appellate courts review such claims *de novo*, reversing only in cases of harmful error. *Unites States v. Woodruff*, 296 F.3d 1041, 1046 (11th Cir. 2002); *See United States v. Sanchez*, 269 F.3d 1250, 1272 (11th Cir. 2001) (en banc), *cert. denied,* 535 U.S. 942 (2002). Where defendants raise sentencing issues for the first time on appeal, however, appellate courts review only for plain error. *United States v. Aguillard*, 217 F.3d 1319, 1320 (11th Cir. 2000).

Bannister argues that the court enhanced his sentence based on facts that were not charged in the indictment or proven to a jury. Because Bannister did not raise this issue during sentencing, we review only for plain error. Reddick raises

28

four distinct sentencing issues. Three are raised here for the first time. However, Reddick did question one issue —the correct method of calculating criminal history points for related convictions under U.S.S.G. § 4A1.2 at his sentencing hearing.

The U.S. Supreme Court has stated that appellate courts should give "due deference" to a district court's application of a 'Sentencing Guidelines term' to the facts. *Buford v. United States*, 532 U.S. 59, 63-64 (2001). Thus, we will not disturb a district court's factual finding on the relatedness of prior convictions unless it is clearly erroneous. *United States v. Hunter*, 323 F.3d 1314, 1322 (11th Cir. 2003); *United States v. Hernandez-Martinez*, 382 F.3d 1304, 1306 (11th Cir. 2004). Valuation of loss is a factual finding that is also reviewed for clear error. *United States v. Cover*, 199 F.3d 1270, 1275 (11th Cir. 2000), but if the issue was not raised at trial, we review only for plain error. *See Aguillard*, 217 F.3d at 1320. Accordingly, we review three of Reddick's sentencing issues for plain error, but we review his challenge of the 2003 criminal history points calculation for clear error.

### III. DISCUSSION

#### A. Reddick and Bannister's Double Jeopardy Challenges

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be twice put in jeopardy of life or limb" for the same offense.

U.S. Const. amend. V, cl. 2. A single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause, however. *Albernaz v. United States*, 450 U.S. 333, 344 n.3 (U.S. 1981); *United States v. Hassoun*, 476 F.3d 1181, 1188-1189 (11th Cir. 2007). The key to determining whether there are in fact two distinct offenses is whether each statute "requires proof of an additional fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). This has become known as the "Blockburger rule." It is a strict statutory construction rule. As the Supreme Court advises us, the *Blockburger* test is satisfied so long as each criminal statute requires proof of a fact that the other does not, "notwithstanding a substantial overlap in the proof offered to establish the crimes." *Albernaz*, 450 U.S. at 338 (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975)).

Reddick and Bannister argue that the Government should not have indicted them for violating both the Bank Robbery Act and the Hobbs Act since these statutes proscribe the same conduct. As we noted previously, the defendants did not raise this issue at trial, so we only review the decision for plain error. This Court has not addressed the question of whether prosecuting someone for armed bank robbery under both the FBRA and the Hobbs Act is multiplicitous. Our sister circuits have, but their decisions are inconsistent. *Compare United States v. Maldonado-Rivera*, 922 F.2d 934, 981-983 (2d Cir. 1990) (holding that the

imposition of punishment for convictions under both § 1951 and § 2113 does not violate the Double Jeopardy Clause) *and United States v. Golay*, 560 F. 2d 866 (8th Cir. 1977) (holding that it was proper to convict under both statutes, but improper to sentence under both).[3]

The very fact that the circuits are split on this issue indicates the district court did not commit plain error in this case. Indeed, we have held that "where neither the Supreme Court nor this Court has ever resolved an issue, and other circuits are split on it, there can be no plain error in regard to that issue." *Aguillard*, 217 F.3d at 1321. Moreover, Bannister's counsel conceded this very point during oral argument on his appeal. Nevertheless, we will analyze the defendants' claims according to the *Blockburger* test. We begin by examining the elements of proof required to sustain a conviction under the FBRA, 18 U.S.C. § 2113 (a) and (d), and those required under the Hobbs Act, 18 U.S.C. § 1951.[4]

The pertinent parts of the FBRA provide that:

§ 2113 Bank Robbery and incidental crimes.

---

[3] The Seventh Circuit examined a district court decision to impose multiple punishments for violations of both the FBRA and the Hobbs Act and found that it did not rise to the level of plain error. See *United States v. McCarter*, 406 F.3d 460, 464 (7th Cir. 2005).

[4] As we noted in *United States v. Lanier*, 920 F.2d 887, 894 (11th Cir. 1991), and *United States v. Boldin*, 772 F.2d 719, 729 (11th Cir. 1985), the *Blockburger* elemental analysis gives rise to a presumption that Congress intended to authorize cumulative punishments. If other evidence, such as the legislative history, contradicts this presumption, we defer to Congress's express intent. *See Lanier*, 920 F.2d at 894; *Boldin*, 772 F.2d at 729; *United States v. Hassoun*, 476 F.3d 1181, 1185 (11th Cir. 2007).The Second Circuit conducted a thorough review of the legislative history of these two statutes in *United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990), and concluded that Congress did intend multiple punishments. We accept our sister circuit's analysis of this issue and need not engage in our own lengthy review of congressional intent.

(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or
Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank or such savings and loan association and in violation of any statute of the United States, or any larceny– Shall be fined under this title or imprisoned not more than twenty years, or both.

(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than twenty-five years, or both.

18 U.S.C. § 2113(a) and (d) (2004).

In contrast, the pertinent part of the Hobbs Act provides that:

§ 1951. Interference with commerce by threats or violence.
Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a) (2004).

A side-by-side comparison of these two statutes shows that they each

require proof of at least one additional fact that would not be needed to sustain a

conviction in the other. The Government can charge someone with an offense under the § 2113 (a) of the FBRA if he uses force or intimidation to take property from a bank or if he enters a bank with the intent to commit a felony therein that will affect the bank and violate any U.S. statute, or to commit larceny therein. The Government can further charge someone with an offense under § 2113 (d) of the FBRA if he assaults someone with a dangerous weapon or puts their life in jeopardy with a dangerous weapon in the course of violating subsection '(a)' of the Act.

The statute does not require any sort of showing that the robbery or attempted robbery affected commerce — a key element of the Hobbs Act. Nor does it require a showing that a perpetrator used a firearm to assault someone during the commission of the offense — the key element of the firearm statute in 18 U.S.C.§ 924(c)(1)(A). Section 2113(d) of the FBRA speaks in broad terms of assault with a "dangerous weapon."

In order to prosecute someone under the Hobbs Act, however, the Government must show that the person committed or attempted to commit robbery, extortion, or an act of physical violence against another person or property and, in so doing, that he affected the flow of interstate commerce. Thus, the Hobbs Act requires proof of an element that is not required under the FBRA — an effect upon interstate commerce.

The defendants argue that any armed robbery which takes place in a federally insured bank would necessarily violate the Hobbs Act, but we do not agree that an act of armed robbery at a federally insured bank must *necessarily* satisfy the FBRA and the Hobbs Act at one and the same time. As this Court noted in *Hassoun*, 476 F.3d at 1185, the key question is "does a scenario exist where the hypothetical defendant might violate one section without violating the other." Surely, one does. For example, suppose that a person entered a federally chartered bank with the intent to steal a collection of art that the bank has exhibited in its lobby. He is armed. He encounters a security guard at gunpoint, who resists him, and who is able to overwhelm him within seconds of entering the door. The bank's interstate commerce transactions are not affected in any way as a result of the skirmish. The Government could clearly prosecute the individual under the FBRA, but not under the Hobbs Act.

Thus, we find no error in the district court's decision to sentence the defendants for convictions under both the FBRA and the Hobbs Act, much less plain error. Similarly, we find that the court did not err when it sentenced Reddick for armed robbery under the FBRA and for brandishing a firearm during a bank robbery pursuant to 18 U.S.C.§ 924(c)(1)(A). And, it certainly did not commit plain error. To satisfy § 2113(d) of the FBRA, the Government only had to show that Reddick assaulted someone or placed his life in jeopardy with a dangerous

weapon when he robbed the SunTrust bank. The same could not be said of 18 U.S.C.§ 924(c)(1)(A). The Government had to show quite specifically that Reddick used a firearm to sustain a conviction under this statute.

## B. The Defendants' Challenges to the Sufficiency of the Evidence

### 1. Reddick's Challenge to the Sufficiency of the Evidence
### &
### the Denial of His Motion for Judgment of Acquittal

The Government presented ample evidence for a jury to find Reddick guilty beyond reasonable doubt on all counts charged. Reddick acknowledged his participation in the April 14, 2004 robbery of the SunTrust bank after his arrest. He did not argue that his statement to police was involuntary, coerced, or solicited in violation of his Miranda rights. Although he questioned the fact that police failed to tape the statement, he did not challenge Detective Houston's veracity in recounting that statement at trial. The Government also presented testimony from Reddick's co-conspirators, Lewis and Wilkerson, which implicated Reddick in the bank robbery and the conspiracy to commit the bank robbery.

Bank surveillance video of the robbery showed an individual who matched Reddick description, in terms of height and weight, brandishing a weapon on bank employees. And, as Detective Houston's testimony revealed, Reddick admitted to holding a firearm on the bank's employees during the robbery when he spoke to police.

35

Finally, the Government presented evidence that the robbery interrupted the flow of interstate commerce at SunTrust bank. Teller Pamela Cenk testified that on any given day the bank would normally handle a number of commercial transactions involving out-of-state banks, such as cashing or depositing checks drawn on out-of-state banks. The bank had to close early on the day of the robbery so that law enforcement could conduct an investigation of the scene and bank officials could audit their funds. As a result the bank could not attend to its regular interstate transactions.

Eva Shaw, a regional manager for SunTrust, who conducted an audit of the bank after the robbery, testified that bank had to ask the U.S. Treasury to replace $46,000 worth of currency that was damaged in the course of the robbery. The currency was damaged when dye packs hidden within it exploded as the robbers left the parking lot. This process delayed the resumption of normal banking activities which, Ms. Shaw testified, included a number of out-of-state transactions.

In view of this evidence, and mindful of all the reasonable inferences it could support, we cannot say that "no trier of fact" could have found Reddick guilty beyond a reasonable doubt. Since that is all that we need determine, we find the evidence against Reddick was sufficient. *See Battle*, 892 F.2d at 998.

Having found the evidence against Reddick to be sufficient, we also find that the court's decision to deny Reddick's motion for judgment of acquittal was proper. Reddick argues that the testimony by the cooperating witnesses, Lewis and Wilkerson, was not credible because the Government had offered them inducements to testify such as, immunity from prosecution and sentencing recommendations. However, a judgment of acquittal is not mandated simply "because the [G]overnment's case includes testimony by an 'array of scoundrels, liars and brigands.'" *United States v. Hewitt*, 663 F.2d 1381, 1385 (11th Cir. 1981) (quoting *United States v. Tiche*, 424 F. Supp. 996, 1000-01 (W.D.Pa.), *aff'd mem.*, 564 F.2d 90 (3d Cir. 1977).

Credibility determinations are the exclusive province of the jury. *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997), modified on other grounds by *United States v. Toler*, 144 F.3d 1423, 1427 (11th Cir. 1998). "The fact that [a witness] has consistently lied in the past, engaged in various criminal activities, [and] thought that his testimony would benefit him . . .does not make his testimony incredible." *United States v. Cravero*, 530 F.2d 666, 670 (5th Cir. 1976).[5] For testimony to be considered incredible as a matter of law, it would have to be unbelievable on its face, "testimony as to 'facts that [the witness] physically

---

[5]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions that the former Fifth Circuit issued prior to October 1, 1981.

could not have possibly observed or events that could not have occurred under the laws of nature.'" *United States v. Rivera*, 775 F.2d 1559, 1561 (11th Cir. 1985) (quoting *United States v. Garner*, 581 F.2d 481, 485 (5th Cir. 1978) (internal quotation omitted)).

### 2. Bannister's Challenge to the Sufficiency of the Evidence

Bannister argues that the Government failed to establish that he was responsible for the First National Bank robbery. Although the Government conceded that he was not present at the robbery, it presented ample circumstantial evidence to link him with the robbery under either a *Pinkerton* theory of vicarious liability or as an aider and abettor. The Government's evidence included testimony that one of the rifles used in the First National Bank robbery was found in apartment 414 at 2100 Australian Avenue, the apartment that Bannister was caught trying to exit on the day of the robbery. His co-conspirator in the SunTrust robbery, John Wilkerson, testified that this was Bannister's rifle and that Bannister moved it upstairs from the apartment where he lived to a friend's apartment because he noticed police parked outside the apartment complex. The rifle had a distinctive sighting mechanism which was evident in bank surveillance film of the robbery.

Wilkerson also testified that he had accompanied Bannister on a shopping excursion the night before the First National Bank robbery. The purpose of that

trip, Wilkerson reported, was to purchase black clothing and gloves to outfit the crew that would hold up the First National Bank.

The Government also presented physical evidence that clearly linked Bannister to the First National Bank robbery. Police testified that they recovered "bait money" from the First National Bank robbery amidst clothing on the floor of unit 315 and in a small safe inside the unit. Numerous other witnesses testified that Bannister resided in this apartment, which was formally rented to Erica Wyatt, his girlfriend and the mother of his infant son. Additionally, both cooperating witnesses testified that Bannister was the mastermind of the First National Bank robbery. The Government presented evidence that implicated Bannister in other bank robberies, such as the SunTrust and Bank of America robberies, which followed the same m.o. utilized in the First National Bank hold-up.

Jurors viewed images from bank surveillance film of the First National Bank robbery which showed the robbers brandishing guns and menacing the employees. Employees also testified to the details of the armed robbery. Finally, First National bank employees such as Rayma Buckles, Patricia Salter, and Eileen St. Denis testified to the bank's role in interstate commerce and the robbery's effect upon the bank's ability to conduct interstate commerce. For example, Buckles testified that she was working on an IRA for an out-of-state customer at the time of the robbery and that the customer had asked her to prepare one for his

daughter, another out-of-state customer. Both efforts had to be interrupted because of the robbery. The bank closed shortly after the robbery, which was around 9:30 in the morning, well in advance of its normal closing hours at 4:00 p.m. Similarly, Salter testified that she often waited on out-of-state customers who would come in to buy certificates of deposit while they were visiting the area during the winter and spring tourist seasons or cashed out-of-state checks. St. Denis, the Vice-President of the bank, also testified that the bank handled numerous interstate transactions in the course of its daily business, and that those transactions had to be interrupted because of the robbery.

We need only ask whether a reasonable fact-finder could have concluded that the evidence established Bannister's guilt beyond reasonable doubt. We find that the answer is "yes," and the evidence was sufficient to convict Bannister on all four counts charged in connection with the First National Bank robbery.

Bannister also argues that there was insufficient evidence to link him to the SunTrust and Bank of America robberies, absent the "bought" testimony of the cooperating witnesses. There is no merit to this argument. The Government also presented DNA evidence that linked Bannister to the SunTrust robbery. For example, the Government presented DNA test results that identified Bannister as the major contributor (present at 12-16 of 16 genetic markers) for DNA profiles collected from at least three items. Those items included: the pillowcase that the

robbers dropped in the parking lot of the SunTrust bank, a glove found in the Dodge Caravan that was used as a getaway car in that robbery and also the steering wheel of the Dodge Caravan, where Bannister was the only contributor. Circumstantial evidence also linked Bannister to the robbery. Police testified that they recovered a matching pillowcase to the one found at SunTrust when they searched the apartment where Bannister lived, and they also recovered a great deal of cash. They also found a rifle that matched the description of the firearm used in the SunTrust robbery when they searched the apartment where Bannister had been hiding before his arrest.

Moreover, Bannister's contention that the Government relied upon the testimony of "bought witnesses," such as Minus, Wilkerson, and Lewis, is unpersuasive. We have held that agreements in which the government trades sentencing recommendations or other official action to secure the cooperation of witnesses do not constitute bribes. *United States v. Lowery*, 166 F.3d 1119, 1124 (11th Cir. 1999). The jury was free to accept or reject the testimony of the cooperating witnesses and Bannister's counsel pointed out the faults in their testimony. The jury found them credible, nonetheless. Accordingly, we are convinced that a reasonable fact-finder could have concluded that Bannister was guilty beyond reasonable doubt of all charges relating to the SunTrust and Bank of America robberies.

***C. Reddick's Evidentiary Challenges***

Reddick argues that the district court erred when it admitted the testimony of "paid accomplices." Reddick did not object to the admission of testimony from cooperating witnesses at trial. Accordingly, our standard of review would be for evidence of plain error. This argument about "paid accomplices" is the same argument that Bannister raised to challenge the sufficiency of the evidence in his case. We need not repeat our preceding discussion on this point, other than to say that our decision in *Lowery*, 166 F.3d at 1124, is controlling here and it rejects this line of argument. Thus, we find no error, much less plain error, in the court's decision to admit this testimony.

***D. Reddick's Challenges to His Sentencing***

*1. The Criminal History Points for His 1998 Conviction*

Reddick argues that the district court erred when it accepted the Pre-Sentencing Investigation ("PSI") report that assigned three criminal history points for offenses that Reddick committed in 1998 when he was seventeen years old. Reddick argues that he was not sentenced as an adult, and thus, these points should not have been assigned. Reddick failed to raise this argument below so we review the court's decision for evidence of plain error. *See Aguillard*, 217 F.3d at 1320.

The PSI lists Reddick's 1998 conviction under the section heading for "Adult Criminal Convictions," rather than the "Juvenile Adjudications" section. However, the PSI indicates that Reddick was 17 years old at the time of his arrest. Reddick failed to object to the way that the 1998 conviction was listed and he also failed to present the district court with any facts that tend to prove that he was not convicted as an adult. And, when Reddick submitted his appellate briefs or appeared before us for oral argument, he also failed to present any facts showing that he had been sentenced as a juvenile in 1998. Thus, it is an open question as to whether he was sentenced as an adult, which is certainly possible, notwithstanding his juvenile status at the time. Accordingly, he has not convinced us that the district court erred at all, much less commit plain error, by adding three points to his criminal history score for the 1998 conviction. See U.S.S.G. § 4A1.2(d)(1).

*2. The Criminal History Points for His 2002 Conviction*

Reddick argues that the PSI incorrectly assessed a criminal history point for his 2002 cocaine conviction because it was related to another sentence that he received for violating probation. Under U.S.S.G. § 4A.1.2(a)(2) "[p]rior sentences imposed in related cases are to be treated as one sentence" for the purpose of assigning criminal history points. Reddick failed to raise this argument below so we review the court's determination that the two convictions were independent under a plain error standard. *See Aguillard*, 217 F.3d at 1320.

In calculating a defendant's criminal history score, the district court must add one point for each prior conviction which resulted in a sentence of less than 60 days. *See* U.S.S.G. § 4A1.1(c). Courts are to count prior sentences imposed in related cases as one sentence. U.S.S.G. § 4A1.2(a)(2). Application Note 3 to this section of the Sentencing Guidelines provides:

> Prior sentences are not considered related if they are for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). Otherwise, prior sentences are considered related if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing.

U.S.S.G. § 4A1.2, comment. (n.3).

Reddick contends that he received a three-day sentence for his 2002 cocaine conviction and that this sentence ran concurrently with a 28.9-month sentence for violation of probation, so that the two sentences were "functionally correlated." This argument is without merit. Reddick was arrested and convicted for possessing cocaine in 2002 while he was serving the probationary portion of his earlier 1998 sentence. That 1998 sentence was for aggravated assault, carrying a concealed firearm, being a delinquent in possession of a firearm, and resisting arrest with violence. Although these two sentences ran concurrently, they were clearly separate, did not involve the same conduct, occurred on different dates and had different docket numbers. *See Hernandez-Martinez*, 382 F.3d at 1307-1308

(holding that, even where two offenses were not separated by an intervening arrest, the offenses were not related because the (1) the offense conduct was unrelated, (2) there was no formal consolidation order, and (3) they had different docket numbers, and (4) the defendant did not dispute that he had received separate judgments).

Accordingly, we find the district court did not err at all, much less commit plain error, in calculating Reddick's criminal history score for the 2002 conviction.

### 3. The Criminal History Points for his 2003 Convictions

Reddick argues that the calculation of his criminal history points for two sentences that he received in 2003 was similarly flawed, i.e., the sentences for the two convictions were related and should have been scored accordingly. The court scored the two sentences separately, assigning four criminal history points to his overall score. Reddick raised this issue at his sentencing. Thus, we review the district court's decision that his 2003 sentences were unrelated for evidence of clear error. *See Hernandez-Martinez*, 382 F.3d at 1306.

In calculating a defendant's criminal history category, a district court must assess two points for each prior sentence of at least 60 day's imprisonment. U.S.S.G. § 4A1.1(b). As we noted in the preceding discussion, "[p]rior sentences

are not considered related if they are for offenses that were separated by an intervening arrest." U.S.S.G. § 4A1.2, comment. (n.3).

According to his PSI, Reddick was arrested on September 2, 2003 for resisting an officer without violence and possession of marijuana. Six days later, on September 8, 2003, he was arrested for possessing no, or an improper license. He received concurrent sentences of 66 days' imprisonment for both sentences. At his most recent sentencing hearing, the probation officer explained that the PSI assigned two points for each of these convictions because they were separated by an intervening arrest. Although Reddick contended that the two sentences were related, he did not counter the probation officer's statement about the intervening arrest. Given that the offense conduct is unrelated, and absent any evidence on the intervening arrest question, it was not clearly erroneous for the district court to assign Reddick's 2003 sentences individual criminal history points.

*4. Calculation of Total Loss Involved in Robbery of SunTrust Bank*

Reddick argues that his PSI should have calculated the total loss from the SunTrust robbery at $46,000 instead of $60,381. Although Reddick and his cohorts initially escaped with $60,318 from SunTrust, they dropped a pillowcase containing $46,000 of this amount when dye packs hidden inside the currency exploded as they were leaving the bank parking lot.  A passerby recovered the pillowcase from the parking lot and turned it into the bank.  The Government

maintains that the PSI correctly employed the $60,318 figure since the Guidelines authorize a figure that "includes the greater of the actual or intended loss."*See* U.S.S.G. §2B1.1 comment. (n.3A).

Ordinarily, we review challenges to valuation of loss calculations for clear error. *United States v. Cover*, 199 F.3d 1270, 1275 (11th Cir. 2000), however, Reddick did not raise this issue at sentencing. Accordingly, we review this issue only for evidence of plain error. *See Aguillard*, 217 F.3d at 1320. Congress amended the U.S.S.G. in 2001, striking the reference to the valuation of loss under section 2B1.1 and inserting a definition of loss that reads "the value of the property, the property taken, damaged or destroyed." *See* U.S.S.G. Appendix C, amendment 617; *see also* U.S.S.G. §2B3.1, comment. (n.3) (Nov. 1, 2004 Manual). Since the district court sentenced Reddick in 2005, the November 1, 2004 Guidelines Manual, which incorporates the amended definition of "loss," applies. This Court has yet to issue a published opinion in which it addresses the current definition of "loss." Nevertheless, it is clear from the Guidelines, that $46,000 was technically "taken" from SunTrust when Reddick and his cohorts stashed $46,000 of the bank's money in a pillowcase and removed the pillowcase from the bank. Furthermore, the money was "damaged or destroyed" when the dye packs hidden within it activated. *See* U.S.S.G. § 2B3.1, comment. (n.3). Eva Shaw, the Bank's Vice-President, testified that SunTrust had to ask the U.S.

Treasury to replace the $46,000 because it was thoroughly damaged when the dye packs exploded. Accordingly, the district court did not clearly err when it determined that the valuation of loss was $60,318.

### E. Bannister's Evidentiary Challenges

Bannister presents three evidentiary issues on appeal. He raised two of them at trial or through pre-trial motions in limine, but he raises a third for the first time on appeal. We review the two evidentiary issues that were raised at trial for abuse of discretion, but we will only reverse if it appears that the error is reasonably likely to have affected the defendant's substantial rights. *See United States v. Beasley*, 72 F.3d 1518, 1524-25 (11th Cir. 1996) (citing *United States v. Sellers*, 906 F.2d 597, 601 (11th Cir. 1990)). We review the third issue for plain error since it was not raised at trial. *See* Fed. R. Crim. P. 52(b); *King*, 73 F.3d at 1571-72.

#### 1. Testimony Regarding Bannister's Custodial Statements

Bannister argues that the district court erred when it allowed the Government to introduce a statement that Bannister made during custodial interrogation. Bannister argues that the statement, which Detective Houston recounted at trial, was an invocation of his Fifth Amendment right to remain silent, which the Government was not allowed to use against him at trial. Bannister's counsel filed a pre-trial motion in limine to keep this statement out.

A statement violates a defendant's right to remain silent if either: "(1) the statement was *manifestly intended* to be a comment on the defendant's failure to testify; or (2) the statement 'was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *United States v. Knowles*, 66 F.3d 1146,1162-63 (11th Cir. 1995) (*internal citation omitted)*. Accordingly, we consider the context in which the statement was made in order to determine what the Government's intent was and what the natural impact of the statement would have been upon the jury. *Id*. at 1163.The pertinent question in determining impact upon a jury is not whether the jury could possibly have viewed the statement in this manner, "but whether the jury would necessarily have done so." *Id*. n.69 (quoting *United States v. Swindall,* 971 F.2d 1531, 1552 (11th Cir. 1992).

Applying this standard to the Government's statement, we conclude that the statement was not intended as a comment on Reddick's failure to testify, nor would the jury have necessarily interpreted it as such. What Detective Houston said was that Bannister agreed to speak with him, after he was duly advised of his Miranda rights, but told him that he didn't do robberies. He also stated that Bannister challenged him to come back again once he could produce a picture or video of Bannister in a bank. Moreover, the challenged statement is not a clear invocation of the defendant's Fifth Amendment right not to testify. *See Medina v.*

49

*Singletary*, 59 F.3d 1095, 1100-01 (11th Cir. 1995). It is clear from the context of the statement that Bannister waived his Miranda rights and agreed to speak with police. Thus, we conclude the district court did not err in admitting this testimony.

*2. Testimony Regarding Uncharged Criminal Conduct*

Bannister's second issue concerns evidence of uncharged criminal conduct. Bannister argues that the district court should not have admitted the testimony of a Government witness concerning a firearm that Bannister allegedly showed him during a social visit. The witness testified that while he was visiting Bannister's apartment he saw Bannister holding an assault rifle with a distinctive sighting mechanism. It matched the description of the firearm used in the Bank of America robbery and the subsequent First National Bank robbery. Bannister suggests that this testimony references uncharged misconduct involving possession of a firearm and that it was unfairly prejudicial under Rule 404(b) of the Federal Rules of Evidence.

Bannister's claim is without merit. He acknowledges in his appellate brief that this Court has held that 404(b) evidence is always admissible to show intent, even where intent is not expressly contested. *See United States v. Matthews*, 431 F.3d 1296, 1317-1318 (11th Cir. 2005). Thus, the district court did not abuse its discretion in admitting testimony that Bannister was seen in possession of a firearm that figured in one bank robbery and would later figure in another.

## 3. Testimony of "Paid" Witnesses

Bannister's third issue concerns the testimony of cooperating witnesses, such as Minus, Wilkerson, and Lewis, who all testified against Bannister. Bannister contends that the Government secured their testimony by offering them immunity from prosecution or the promise of lower sentences for favorable testimony. Thus, Bannister asserts that these witnesses were essentially "paid" witnesses. We have held that agreements in which the government trades sentencing recommendations or other official action to secure the cooperation of witnesses do not constitute bribes. *Lowery*, 166 F.3d at 1124. Bannister acknowledges that this is Eleventh Circuit precedent in his appellate brief. In view of this fact, there is no way that the district court could have committed plain error by allowing this testimony.

## F. Bannister's Challenges to His Sentencing

Bannister argues that the district court improperly sentenced him to two consecutive 25-year jail terms for using a firearm during the First National and SunTrust bank robberies since the indictment did not charge that either of the convictions was "second or subsequent" to his Bank of America firearm conviction. Bannister acknowledges that Eleventh Circuit precedent holds that an indictment need not charge that additional convictions under 18 U.S.C. § 924(c)(1)(C) were "second or subsequent." *See United States v. Woodruff*, 296

F.3d 1041, 1050 (11th Cir. 2002). Bannister did not raise this issue below, so we review the alleged sentencing error under a plain error standard. *See Aguillard*, 217 F.3d at 1320.

Applying that standard, we find that the district court did not commit plain error when it sentenced Bannister in keeping with our precedent in *Woodruff*. And, nothing in subsequent sentencing case law disturbs that holding. *See Blakely v. Washington*, 542 U.S. 296 (2004). Thus, for example, in the 2004 *Blakely v. Washington* decision, the Supreme Court reiterated that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Blakely*, 524 U.S. at 301. This is what we stated in *Woodruff*, 296. F.3d at 1050. Moreover, the jury made specific findings that Bannister was guilty of each bank robbery and that he used a firearm during those robberies. Thus, these facts were proven to a jury beyond a reasonable doubt.

## CONCLUSION

The defendant's convictions and sentences under the FBRA and the Hobbs Act were not multiplicitous according to the *Blockburger* test. Each statute requires proof of an element that the other does not. The Government presented sufficient evidence against both defendants to convince a jury that they were guilty beyond reasonable doubt. It was not plain error for the district court to allow the

Government to present testimony from cooperating witnesses against either of the defendants. And, the district court did not abuse its discretion when it admitted testimony regarding Bannister's custodial statement or his possession of a firearm. Finally, we find no error in the district court's application of the sentencing guidelines in either defendants' case.

Accordingly, the district court decision is **AFFIRMED.**